OPINION
{¶ 1} Relators, Aurelia Acker et al., commenced this original action in mandamus seeking an order compelling respondents, William E. Green, Superintendent of Apple Creek Developmental Center ("ACDC") and Kenneth W. Ritchey, Director, Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD"), to establish an early retirement incentive plan ("ERIP") effective retroactively from February 4, 2003, for the maximum number of years permitted by law for each relator.
 {¶ 2} Pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Relying upon R.C.145.298 and 5123.032, the magistrate found that respondents were required to make an ERIP available to employees of ACDC and Springview Developmental Center ("Springview") from the date in early January 2003 when Governor Bob Taft announced his intention to close these centers. The magistrate further found that pursuant to R.C. 145.297(C), respondents have the discretion to limit the number of employees eligible for the ERIP to five percent of the employee workforce at ACDC and Springview. Lastly, the magistrate found that respondents had the discretion under R.C. 145.297(D) to offer a one-year purchase of service credit. Therefore, the magistrate has recommended that we grant a writ of mandamus consistent with these findings.
 {¶ 3} Respondents have filed objections to the magistrate's decision. Respondents first argue that the magistrate erred by looking to language in R.C. 5123.032(C) in determining the meaning of the word "announced" in R.C. 145.298. We agree. But, this conclusion does not determine the outcome of respondents' objections.
 {¶ 4} Although R.C. 5123.032 and 145.298 both address, at least in part, the proposed closure of ODMRDD facilities, they address very different aspects of the closure process. R.C.5123.032 establishes a process through which the General Assembly has input into the decision-making process for the possible closure of a developmental center. This statute requires the governor to notify the General Assembly of the governor's proposed closure of a developmental center, thereby triggering an independent study by the Legislative Service Commission ("LSC"). The study must address relevant criteria and factors, including, but not limited to, the factors set out in the statute. R.C.5123.032(C). LSC must complete the study and prepare a report no later than 60 days after the governor's notification to the General Assembly. R.C. 5123.032(D). That report is submitted to a closure commission that must be established as provided in the statute no later than the date on which LSC's report is due. The closure commission then makes a non-binding recommendation to the governor regarding the governor's proposed closing. R.C.5123.032(E). The governor's notification to the General Assembly of the proposed closing is the governor's official announcement for purposes of triggering this process. R.C. 5123.032(C).
 {¶ 5} R.C. 145.298 addresses the obligation of certain state institutions, including ODMRDD, to establish a retirement incentive plan upon the closing of an institution or a massive layoff. R.C. 145.298 makes no mention of the governor, the General Assembly or R.C. 5123.032. Pursuant to R.C. 145.298(B), the employing unit (here ODMRDD) must establish a retirement incentive plan for persons employed at the institution in the event of a "proposal" to close the state institution. That plan must "go into effect at the time the layoffs or proposed closings are announced and shall remain in effect until the date of the layoffs or closings." R.C. 145.298(D)(1).
 {¶ 6} Contrary to the conclusion reached by the magistrate, we fail to see how the governor's obligation under R.C. 5123.032
to notify the General Assembly of a proposed closing of a development center aids in interpreting the requirements set forth in R.C. 145.298. The fact that the governor's notification to the General Assembly is the official announcement for purposes of triggering the process for legislative input sheds no light on what constitutes the announcement of a proposed closing under R.C. 145.298. Moreover, R.C. 145.298 was adopted in 1986 and amended in 1995. R.C. 5123.032 did not become effective until 2004 and it makes no mention of R.C. 145.298. Therefore, contrary to the magistrate's conclusion, R.C. 5123.032 provides no guidance on the meaning of an "announced" closing for purposes of R.C. 145.298.
 {¶ 7} Respondents also argue that relators have no clear right to a writ of mandamus because R.C. 145.298 grants the state institution discretion regarding when it must make the ERIP available to its employees. We disagree.
 {¶ 8} R.C. 145.298(B) requires certain employing units, including ODMRDD, to implement an early retirement incentive plan in the event of a proposal to close a state institution. It provides in pertinent part:
In the event of a proposal to close a state institution * * * the employing unit responsible for the institution's operation shall establish a retirement incentive plan for persons employed at the institution.
 {¶ 9} R.C. 145.298(D)(1) addresses when the ERIP must go into effect. It provides in pertinent part:
A retirement incentive plan established under this section shall be consistent with the requirements of section 145.297
[145.29.7] of the Revised Code * * * except that the plan shall go into effect at the time * * * proposed closings are announced and shall remain in effect until the date of the * * * closings.
 {¶ 10} Contrary to respondents' contention, we fail to find ambiguity in this statutory language. R.C. 145.298(B) clearly requires the employing unit responsible for the institution's operation to establish a retirement incentive plan when there is a proposal to close a state institution. That plan must go into effect at the time the proposed closings are announced and must remain in effect until the date of the closings. R.C.145.298(D)(1). Therefore, when ODMRDD proposes to close a state institution, it must establish an ERIP and the ERIP must go into effect at the time the proposed closing is "announced."
 {¶ 11} Respondents argue that the meaning of the word "announced" is ambiguous. Again, we disagree.
 {¶ 12} The polestar of statutory interpretation is legislative intent, which a court best gleans from the words the General Assembly used and the purpose it sought to accomplish. Where the wording of a statute is clear and unambiguous, this court's only task is to give effect to the words used. State v.Elam (1994), 68 Ohio St.3d 585, 587. Moreover, a legislative body need not define every word it uses in an enactment. Any term left undefined by statute is to be accorded its common, everyday meaning. State v. Dorso (1983), 4 Ohio St.3d 60, 62. "`Words in common use will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them.'" Id., citing Eastman v. State (1936), 131 Ohio St. 1, paragraph four of the syllabus.
 {¶ 13} The word "announced" is not specifically defined in R.C. 145.298. Therefore, we must apply its plain and ordinary meaning. We find that the plain and ordinary meaning of the word "announced" is "to give public notice of, make known officially or publicly, deliver news of: PROCLAIM." Webster's Third New International Dictionary (1966) 87. Applying this meaning to the language in R.C. 145.298(D)(1), we conclude that when ODMRDD proposes to close a developmental center, it must establish an ERIP, and the ERIP must become effective at the time the public is officially notified of the proposed closure.
 {¶ 14} The parties stipulated that on February 4, 2003, the superintendent of ACDC released a memorandum to all ACDC employees which stated in relevant part:
Due to the unprecedented crisis in the state budget, ODMRDD has determined that Apple Creek Developmental Center (ACDC) will close. Our Department projects this to occur by June 30, 2006.
 {¶ 15} Furthermore, on or about February 5, 2003, ODMRDD posted an article on its website entitled "ODMRDD NamesDevelopmental Centers To Be Closed." The first sentence of the article states:
Developmental Centers in Apple Creek and Springfield will be closed as a result of severe budget deficits facing the State of Ohio.
 {¶ 16} Under any reasonable interpretation, these communications from the superintendent of ACDC and from ODMRDD constituted public announcements of ODMRDD's proposal to close ACDC, thereby triggering the requirements set forth in R.C.145.298(D)(1).
 {¶ 17} Respondents contend that requiring ODMRDD to offer employees early retirement opportunities while the desirability of the closure is still being debated is unduly expensive and potentially disruptive to the continued operation of the developmental center. Essentially, respondents challenge the General Assembly's wisdom in enacting these provisions. However, it is not this court's role to second-guess the General Assembly's policy decisions. Respondents concede that the plain purpose of R.C. 145.298 is to mitigate the economic hardships that accompany institutional closures by bringing retirement more easily within reach of employees near the end of their careers. Moreover, as the magistrate points out, R.C. 145.297(C)(3) provides that the employing unit "may limit the number participants in the plan to a specified percentage of its employees who are members of the public employees retirement system on the date the plan goes into effect." Therefore, the legislature already considered and addressed the administrative concerns now raised by respondents.
 {¶ 18} Respondents also object to the magistrate's decision because the decision purports to require respondents to offer an ERIP to eligible employees of Springview. Respondents point out that all of the relators are employees, or former employees of ODMRDD, working or formally working at ACDC. None of relators worked at Springview. Therefore, respondents contend that relators lack standing to seek a writ of mandamus requiring respondents to offer an ERIP to Springview employees. Apparently, relators do not dispute this contention.[1]
 {¶ 19} We agree that none of the relators have standing to assert any rights with respect to the Springview facility. Therefore, we sustain this objection.
 {¶ 20} Lastly, respondents argue that this action is moot as to all relators except the seven ACDC employees who retired between February 4, 2003, when the closure announcement was made, and June 19, 2005, the date ODMRDD offered the ERIP. We agree.
 {¶ 21} Making the ERIP available retroactively to February 4, 2003 to those ACDC employees who did not retire prior to June 19, 2005 (the date on which the ERIP was instituted) would be a vain act because those employees worked during that period of time. Employees cannot retroactively retire. Mandamus will not lie to compel a vain act or to resolve a dispute that has become moot.State ex rel. Morenz v. Kerr, 104 Ohio St.3d 148,2004-Ohio-6208, at ¶ 35-36. The fact that it is possible that some of these employees might have chosen to retire during this timeframe if an ERIP had been available is irrelevant. We cannot turn back the clock. Therefore, we sustain respondents' objections to the extent it seeks to limit the writ of mandamus to the seven relators who retired between February 4, 2003 and June 19, 2005 and were not offered an ERIP.
 {¶ 22} Following an independent review of this matter, we find that magistrate has properly determined the facts and, therefore, we adopt the magistrate's findings of fact. We adopt the magistrate's conclusions of law as modified by this opinion. In accordance with the magistrate's decision, as modified, we grant a writ of mandamus ordering respondents to construe the effective date of the ERIP for the seven eligible ACDC employees/relators as February 4, 2003. In doing so, respondents have the discretion to limit the number of eligible employees as provided by law and to only offer a one-year purchase of service credit. R.C. 145.297(D).
Objections sustained in part and overruled in part; writ ofmandamus granted.
Petree and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
[State ex rel.] Aurelia Acker et al., :
Relators, :
v. : No. 04AP-1335
William E. Green, Superintendent, : Apple Creek Developmental Center and Kenneth W. Ritchey, Director, : Ohio Department of Mental Retardation and Developmental Disabilities, :
Respondents. :
 MAGISTRATE'S DECISION Rendered on October 31, 2005 Blaugrund, Herbert Martin, Incorporated, and Marc E.Myers, for relators.
Jim Petro, Attorney General, Nicole S. Moss, Sloan T.Spalding, and Jack W. Decker, for respondents.
 IN MANDAMUS {¶ 23} Relators Aurelia Acker et al., have filed this original action requesting that this court issue a writ of mandamus ordering respondents William E. Green, Superintendent of Apple Creek Developmental Center ("ACDC") and Kenneth W. Ritchey, Director of Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD"), to establish a mandatory retirement incentive plan, effective retroactively from February 4, 2003, for the maximum number of years permitted by law for each relator.
Findings of Fact:
 {¶ 24} 1. There are 52 relators in this action who are employees or former employees of the ODMRDD, employed or formerly employed at ACDC.
 {¶ 25} 2. ACDC is one of 12 facilities in the state of Ohio operated under the jurisdiction of the ODMRDD. As such, ACDC is a "state institution" as that term is used in R.C. 145.298(B).
 {¶ 26} 3. William E. Green is the superintendent of ACDC.
 {¶ 27} 4. On February 4, 2003, Green authored a memorandum directed to all employees of ACDC informing the employees of the following:
Due to the unprecedented crisis in the state budget, ODMRDD has determined that Apple Creek Developmental Center (ACDC) will close. Our Department projects this to occur by June 30, 2006. * * *
* * *
There will obviously be a great deal of work needed on behalf of both the residents and you, the staff of ACDC, in order to accomplish this task. We will immediately begin designing a placement model to assist residents and their guardians/love ones, based upon individual choice, to select state-operated or community residential services.
In addition, the collective bargaining agreements shall be adhered to for bargaining unit members and the Ohio Administrative Code will be followed for bargaining unit exempt employees. There will be an early retirement incentive program (ERIP) offered at ACDC and the Department is also looking at additional alternatives such as (i.e., employment opportunities which may occur in other centers).
 {¶ 28} 5. The following day, on February 5, 2003, an article was placed on the website for ODMRDD indicating that "Developmental Centers in Apple Creek and Springfield will be closed as a result of severe budget deficits facing the State of Ohio. * * * Springview will close by June 30, 2005, and Apple Creek by June 30, 2006."
 {¶ 29} 6. R.C. 5123.032, effective January 30, 2004, was passed by the Ohio Legislature. R.C. 5123.032 created a legislative service commission to conduct an independent study for the purpose of making recommendations to the governor of the state of Ohio regarding whether any developmental centers should be closed. By its language, R.C. 5123.032 applied to the proposed actions regarding ACDC.
 {¶ 30} 7. On June 1, 2004, the closure commission presented its report to the governor and recommended that both ACDC and Springview Developmental Center ("Springview") be closed.
 {¶ 31} 8. On June 20, 2005, Green issued a memorandum to all employees of ACDC informing them of the Early Retirement Incentive Plan ("ERIP") which had been approved. That memorandum provided the following relevant information:
We have received approval to make available the mandatory 1 year Early Retirement Incentive Plan (ERIP) for Apple Creek Developmental Center (ACDC) by the end of the month and will soon have an effective date. The plan will be open on the effective date and remain in effect until the day that ACDC closes. * * *
You are eligible for the Retirement Incentive Plan if you meet the eligibility requirements of Section 145.32, 145.34, 145.37, or 145.33 (A) on or before the date of termination of the plan, or if the purchase of the one year service credit places you in one of the 3 categories:
• A member, who has passed his or her sixtieth birthday and has (or will have with the ERI) five or more years of total service credit; or
• A member who has (or will have with the ERI) twenty-five or more years of service credit and has attained his or her fifty-fifth birthday; or
• A member who has (or will have with the ERI) thirty or more years of total Ohio service credit, regardless of age.
 {¶ 32} 9. Seven of the relators identified in the within action retired after February 4, 2003 but before June 19, 2005.[2]
 {¶ 33} 10. On April 1, 2005, an ERIP was offered to the employees of Springview, scheduled to close between July 1 and July 9, 2005. Just as the ERIP for ACDC, the ERIP for Springview allowed for the purchase of one year of service credit.
 {¶ 34} 11. On September 8, 2004, an arbitrator found that the grievance regarding the time of and the extent of the ERIP was not arbitrable under the collective bargaining agreement.
 {¶ 35} 12. On December 13, 2004, relators filed the within mandamus action alleging the following: (1) respondents were required to make available an ERIP relative to the closure of ACDC and Springview in February 2003, when it was first "announced" that those centers would be closed; and (2) respondents were required to offer a five-year ERIP to relators because such a plan was approved in August 1989 when the Broadview Developmental Center closed.
Conclusions of Law:
 {¶ 36} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law.State ex rel. Berger v. McMonagle (1983), 6 Ohio St.3d 28.
 {¶ 37} As stated previously, there are two issues in the present case: (1) whether respondents were required to make available an ERIP relative to the closure of ACDC and Springview in February 2003 when it was first "announced" that those centers would be closed; and (2) whether respondents were required to offer a five-year ERIP to relators because such a plan was approved in August 1989 when the Broadview Developmental Center closed.
 {¶ 38} Relative to the first issue, relators contend that respondents were required to offer an ERIP as of February 4, 2003, the date of Green's memorandum indicating that ACDC and Springview were slated for closure. Relators contend that Green's memorandum constituted the "announcement" anticipated by R.C.145.299(D)(1). In response, respondents have submitted evidence, in the form of affidavits, attesting to the anticipated and unanticipated delays inherent in the closing of developmental centers and the potential difficulties, in terms of providing adequate staffing, of offering an ERIP too early. Respondents advocate the offering of an ERIP at the time that ODMRDD files its layoff rationale or retention point calculation with the Ohio Department of Administrative Services for the contemplated closure of both ACDC and Springview.
 {¶ 39} Relative to the second issue, relators contends that respondents were required to offer them the maximum number of years permitted by law under R.C. 145.298, which is five years. In response, respondents contend that they are permitted to offer a minimum of one year of service credit and a maximum of five years of service credit and that the decision is discretionary.
 {¶ 40} R.C. 145.297 provides for the creation of retirement incentive plans, such as the ERIPs at issue herein, and the requirements for those ERIPs. Pursuant to R.C. 145.297(B) an employing unit may establish a retirement incentive plan for its eligible employees. All the terms of the retirement incentive plan are to be in writing and the plan shall remain in effect for at least one year. Furthermore, every retirement incentive plan is to include provisions for the timely and impartial resolution of grievances and disputes.
 {¶ 41} Pursuant to R.C. 145.297(C):
Any classified or unclassified employee of the employing unit who is a member of the public employees retirement system shall be eligible to participate in the retirement incentive plan established by the employee's employing unit if the employee meets the following criteria:
(1) The employee is not any of the following:
(a) An elected official;
(b) A member of a board or commission;
(c) A person elected to serve a term of fixed length;
(d) A person appointed to serve a term of fixed length * * *.
(2) The employee is or will be eligible to retire under section145.32, 145.34, 145.37, or division (A) of section 145.33 of the Revised Code on or before the date of termination of the retirement incentive plan. * * *
(3) The employee agrees to retire under section 145.32, 145.34,145.37, or division (A) of section 145.33 of the Revised Code within ninety days after receiving notice from the public employees retirement system that service credit has been purchased for the employee * * *.
 {¶ 42} R.C. 145.297(C) also provides for certain discretion on behalf of the employing unit as follows:
Participation in the plan shall be available to all eligible employees except that the employing unit may limit the number of participants in the plan to a specified percentage of its employees who are members of the public employees retirement system on the date the plan goes into effect. The percentage shall not be less than five per cent of such employees. * * *
 {¶ 43} Furthermore, pursuant to subsection (D), each retirement incentive plan "shall provide for purchase of the same amount of service credit for each participating employee, except that the employer may not purchase more service credit for any employee than the lesser of the following: (1) Five years of service credit; (2) An amount of service credit equal to one-fifth of the total service credited to the participant under this chapter, exclusive of service credit purchased under this section."
 {¶ 44} R.C. 145.298 further provides for retirement incentive plans, in relevant part, as follows:
(A) As used in this section:
(1) "State employing unit" means an employing unit described in division (A)(2) of section 145.297 of the Revised Code.
(2) "State institution" means a state correctional facility, a state institution for the mentally ill, or a state institution for the care, treatment, and training of the mentally retarded.
(B) In the event of a proposal to close a state institution * * *, the employing unit responsible for the institution's operation shall establish a retirement incentive plan for persons employed at the institution.
* * *
(D)(1) A retirement incentive plan established under this section shall be consistent with the requirements of section145.297 of the Revised Code, * * * except that the plan shall go into effect at the time the * * * proposed closings are announced and shall remain in effect until the date of the * * * closings.
 {¶ 45} Partially in response to the anticipated closures of ACDC and Springview, the Ohio Legislature passed R.C. 5123.032
which provides, in relevant part, as follows:
(B) * * * Notwithstanding any other provision of law, if the governor announced on or after January 1, 2003, and prior to the effective date of this section the intended closure of a developmental center and if the closure identified in theannouncement has not occurred prior to the effective date of this section, the closure identified in the announcement shall be subject to the criteria set forth in this section as if theannouncement had been made on or after the effective date of this section * * *.
(C) * * * Notwithstanding any other provision of law, if the governor announced on or after January 1, 2003, and prior to the effective date of this section the intended closure of a developmental center and if the closure identified in theannouncement has not occurred prior to the effective date of this section, not later than ten days after the effective date of this section, the governor shall notify the general assembly in writing of the prior announcement and that the governor intends to close the center identified in the prior announcement, and the notification to the general assembly shall constitute, for purposes of this section, the governor's official, public announcement that the governor intends to close that center.
* * * When the governor notifies the general assembly as required by this division, the legislative service commission promptly shall conduct an independent study of the developmental centers of the department of mental retardation and developmental disabilities and of the department's operation of the centers, and the study shall address relevant criteria and factors * * *.
* * *
(D) The legislative service commission shall complete the study required by division (C) of this section, and prepare a report that contains its findings, not later than sixty days after the governor makes the official, public announcement that the governor intends to close one or more developmental centers as described in division (C) of this section. * * *
Not later than the date on which the legislative service commission is required to complete the report under this division, the mental retardation and developmental disabilities developmental center closure commission is hereby created as described in division (E) of this section. * * * (E)(1) A mental retardation and developmental disabilities developmental center closure commission shall be created at the time and in the manner specified in division (D) of this section. * * *
The closure commission shall meet as often as is necessary for the purpose of making the recommendations to the governor that are described in this division. The closure commission's meetings shall be open to the public, and the closure commission shall accept public testimony. * * * The closure commission shall meet for the purpose of making recommendations to the governor, which recommendations may include all of the following:
(a) Whether any developmental center should be closed;
(b) If the recommendation described in division (E)(1)(a) of this section is that one or more developmental centers should be closed, which center or centers should be closed;
(c) If the governor's notice described in division (C) of this section identifies by name one or more developmental centers that the governor intends to close, whether the center or centers so identified should be closed.
(2) The mental retardation and developmental disabilities developmental center closure commission, not later than sixty days after it receives the report of the legislative service commission under division (D) of this section, shall prepare a report containing its recommendations to the governor. * * * Upon receipt of the closure commission's report, the governor shall review and consider the commission's recommendation. The governor shall do one of the following:
(a) Follow the recommendation of the commission;
(b) Close no developmental center;
(c) Take other action that the governor determines is necessary for the purpose of expenditure reductions or budget cuts and state the reasons for the action.
The governor's decision is final. Upon the governor's making of the decision, the closure commission shall cease to exist. Another closure commission shall be created under this section each time the governor subsequently makes an official, publicannouncement that the governor intends to close one or more developmental centers.
(Emphasis added.)
 {¶ 46} Relators and respondents have spent the majority of their briefs discussing what constitutes the "announcement" of a proposed closing to trigger the effective date of a retirement incentive plan created under R.C. 145.297 and 145.298. As stated previously, R.C. 145.298(D)(1) provides, in pertinent part:
(D)(1) A retirement incentive plan established under this section shall be consistent with the requirements of section145.297 of the Revised Code, * * * except that the plan shall go into effect at the time the * * * proposed closings areannounced and shall remain in effect until the date of the * * * closings.
(Emphasis added.)
 {¶ 47} As stated previously, relators contend that the February 4, 2003 memorandum from Green constitutes the "announcement" for purposes of triggering the effective date of the ERIP in question. In contrast, respondents contend that, for all practical purposes, the date of the "announcement" must be significantly later due to the numerous hurdles which must be crossed before a center can be closed. According to respondents, there are many "proposals" and "announcements" regarding the closure of any state institution. As such, the parties contend that the word "announcement" is ambiguous and make numerous arguments suggesting that this court interpret the word one way or another. However, upon review of the entire matter, the magistrate finds this to be a relatively easy question to answer.
 {¶ 48} R.C. 5123.032 clearly provides an identifying date for determining the date of the "announcement" throughout. Specifically, in terms of the retroactivity of the statute, R.C.5123.032(B) provides that:
* * * Notwithstanding any other provision of law, if the governor announced on or after January 1, 2003, and prior to the effective date of this section the intended closure of a developmental center and if the closure identified in theannouncement has not occurred prior to the effective date of this section, the closure identified in the announcement shall be subject to the criteria set forth in this section as if theannouncement had been made on or after the effective date of this section * * *.
(Emphasis added.)
 {¶ 49} Furthermore, subsection (C) provides:
* * * Notwithstanding any other provision of law, if the governor announced on or after January 1, 2003, and prior to the effective date of this section the intended closure of a developmental center and if the closure identified in theannouncement has not occurred prior to the effective date of this section, not later than ten days after the effective date of this section, the governor shall notify the general assembly in writing of the prior announcement and that the governor intends to close the center identified in the prior announcement, and the notification to the general assembly shall constitute, for purposes of this section, the governor's official, public announcement that the governor intends to close that center.
(Emphasis added.)
 {¶ 50} R.C. 5123.032 uses the word "announced" or "announcement" at least 11 times and, each time it is clear that the legislature is referring to the governor's announcement that a particular developmental center has been identified as one that the governor intends to close. Although the record does not specifically indicate the exact date that Governor Robert Taft made the "announcement" that he intended to close ACDC and Springview, it is apparent from the record that this occurred some time in early 2003. As such, the magistrate finds that the date of the governor's "announcement" is the date to be used to trigger the effect of R.C. 145.298(D)(1). Furthermore, the magistrate finds that respondents' arguments that all of the qualified employees will retire and that the patients' care will be compromised can easily be avoided. As stated previously, R.C.145.297(C) provides that the employing unit "may limit the number of participants in the plan to a specified percentage of its employees who are members of the public employees retirement system on the date the plan goes into effect." The problems that council for respondents advance will not materialize.
 {¶ 51} With respect to relators' second issue, the magistrate finds that the statute is equally clear here. Pursuant to R.C.145.297(D), the maximum amount of service credit that may be purchased for any employee is "five years of service credit." Nothing in R.C. 145.297 requires that the employees receive at least five years of service credit and the fact that other employees of developmental centers have been offered up to five years of service credit in the past, does not require respondents to offer these relators five years of service credit in the instant case. Instead, it is clear that respondents must offer no less than one year of service credit and no more than five years of service credit.
 {¶ 52} Based on the foregoing, the magistrate finds that relators have demonstrated that they are entitled to a writ of mandamus ordering respondents to construe the effective date of the offering of the ERIP for the eligible employees of Apple Creek Developmental Center and Springview Developmental Center from the date in early January when Governor Robert Taft announced his intent to close these centers. In doing so, respondents have the discretion to limit the number of eligible employees to five percent of the employees and, to the extent that any of those employees who are relators herein who would have been eligible, they can then decide whether they would have accepted respondents' offer or not. Furthermore, respondents clearly had the discretion to only offer a one-year purchase of service credits.
[1] Relator never asserted any claims based upon the proposed closing of Springview.
[2] Russell Phillips, Jane Poulson, Emma Benson, Pattie Carpenter, Fred Dooley, Richard Gentry, and Charlotte Gravius.