OPINION
{¶ 1} Defendant-appellant, Thyais M. Blocker, appeals from the judgment of the Franklin County Municipal Court whereby the trial court convicted appellant of misconduct at an emergency, in violation of R.C.2917.13, pursuant to a jury trial.
 {¶ 2} On November 12, 2005, plaintiff-appellee, the State of Ohio, charged appellant with misconduct at an emergency, in violation of R.C.2917.13(A)(1), alleging that:
 * * * [O]n or about the 12th day of November, 2005 [appellant] did: knowingly hamper the lawful operation of medical person[s], to wit: Tony Eberly [and] Todd Huss[,] Clinton Medics[,] by getting between them and the patient[,] by screaming, yelling, cursing[,] telling them they need to leave because they didn't know what they were doing when they were engaged in their duties assessing the patient Imani Brown ["Brown"] * * * and by doing so created a risk of physical harm to Ms. Brown (who was complaining of bleeding) preventing the medics from providing medical aid to Ms. Brown * * *.
 {¶ 3} The misconduct at an emergency charge constituted a first-degree misdemeanor because of the allegation that appellant created a risk of physical harm to another. See R.C. 2917.13(C). Otherwise, misconduct at an emergency constitutes a fourth-degree misdemeanor.
 {¶ 4} Appellant pled not guilty, and a jury trial ensued. At trial, appellant's trial counsel suggested "we could stipulate that this was an emergency call[.]" (Tr. at 82.) The trial court responded that it wanted "a response from [appellee] regarding the stipulation that it was an emergency situation[,]" noting "that's one of the elements of the trial and, if there's a stipulation to it, then that can be taken care of." (Tr. at 84.) However, the parties made no ultimate agreement on the stipulation.
 {¶ 5} During trial, Tony Eberly testified to the following on appellee's behalf. Eberly is a paramedic with the Clinton Township Fire Division. A paramedic is a type of emergency medical technician. On November 12, 2005, Eberly was working with paramedic Todd Huss. That day, Eberly and Huss were dispatched to appellant's apartment and, upon arrival, the paramedics "were met at the door by [appellant]." (Tr. at 22.) Appellant told the paramedics that her sister, Imani Brown, was experiencing abdominal pain. The paramedics walked into appellant's apartment and saw Brown lying "just outside of the bathroom door in the hallway in a semi fetal position with her face down in the carpet." (Tr. at 24.) Brown's other sister, Akita Miller, "was standing above" Brown. (Tr. at 24.) Brown complained of abdominal pain and indicated that she was bleeding. Huss then asked Brown some questions, but Brown was not "really answering questions in an effective manner where [he and Eberly] could hear her because she had her face in the carpet." (Tr. at 26.)
 {¶ 6} Next, Huss asked Brown if she could move to the living room couch, and Brown affirmed. Although Brown, "under her own power" walked to the living room couch, Eberly did not know whether anyone helped her up from the floor. (Tr. at 27.) When Brown reached the couch, she "immediately went back down into a semi fetal position with her arms tucked up underneath her and her face in the cushion." (Tr. at 28.) Huss then asked Brown to sit up and, after Brown complied, Eberly checked her blood pressure. However, Brown would lie back down, and Huss again told Brown to sit up "so that we could communicate." (Tr. at 31.) Brown would again comply.
 {¶ 7} While Brown was on the couch, Huss asked about her abdominal pain. Huss also asked Brown if there "was any possibility that she could have been pregnant * * * if she was on any contraceptives, * * * if she was either about to [be] or [was] on her menstrual cycle at this point, if she had any bleeding, any cramping, any difficulty urinating, if there was any change in the pain." (Tr. at 40.)
 {¶ 8} After Huss asked Brown about her menstrual cycle, appellant stated that she wanted Huss' and Eberly's names, badge numbers, and "certification numbers." (Tr. at 38.) Appellant also wanted their supervisor's name and phone number. Appellant indicated that she was going to file a complaint. Appellant "would almost begin another question before she finished the first one. They just rolled right off her mouth. And she was * * * belligerent at this point. She attempted to raise her voice over [Eberly's] any time [Eberly] answered anything." (Tr. at 39.) Appellant was loud, "boisterous [and] belligerent" and her "lips were trembling[.]" (Tr. at 40, 45.) There was anger in the tone of her voice. Appellant "continued to raise her voice over [Eberly's] * * *, so she was nearly screaming[.]" (Tr. at 40.) When Eberly gave appellant his "lieutenant's [phone] number," appellant "had her cell phone out. She was trying to dial and talk at the same time[.]" (Tr. at 40.) Overall, Eberly was answering appellant's questions for "about 30 seconds[.]" (Tr. at 45.)
 {¶ 9} Eberly was unable to assist Brown while he was "dealing with" appellant. (Tr. at 40.) Meanwhile, at the time, Huss was unable to assist Brown because he was "engaged in another issue with" Miller. (Tr. at 41.) During the course of events, Huss asked Eberly to call the police, and Eberly walked outside of appellant's apartment building to call the police.
 {¶ 10} Appellant followed Eberly outside the apartment building and asked why Eberly was calling the police. When Eberly eventually proceeded back inside the apartment, appellant was standing in the "common hallway near the entrance to her actual apartment" unit. (Tr. at 47.) Appellant stated: "I don't want you going back into my apartment. I won't give you permission to go back in." (Tr. at 46-47.) Appellant was still screaming, and Eberly "had to stop and tell her that [he] wasn't going to argue with her anymore and that the police would be there [and] she could argue with them if she'd like." (Tr. at 48.) The conversation lasted "[l]ess than a minute[,]" but the situation did "slow [Eberly] down[.]" (Tr. at 47-48.)
 {¶ 11} While inside the apartment, appellant told Huss that she wanted Eberly to leave. Appellant was still yelling and "obviously agitated." (Tr. at 49.) Huss explained to her why the police were coming; Huss' conversation with appellant lasted "[l]ess than a minute." (Tr. at 50.) Huss was unable to assist Brown while he was talking to appellant.
 {¶ 12} "Shortly after this, another male subject walked in who wasn't present for any of this * * *. [Huss] * * * said * * * the police are already on their way, the engine company's going to respond too, we'll just wait outside." (Tr. at 50-51.) Thus, Eberly and Huss walked outside the apartment building. They left the apartment because "somebody else there had made a threatening statement[.]" (Tr. at 51.)
 {¶ 13} Approximately three minutes later, Clinton Township Fire Division Lieutenant Brown ("lieutenant") and other members of the fire department arrived. Additionally, Columbus Police Officer Ronald Lemmon arrived. Appellant was standing "outside in a grassy area to the right of the entrance door to the building." (Tr. at 56.) As Huss, Eberly, the fire department members, the lieutenant and Officer Lemmon proceeded into the apartment building, appellant approached and screamed: "`You're not going back into my fucking apartment[.]'" (Tr. at 56.) Officer Lemmon "had to stop" and "deal with" appellant, and Huss, Eberly, the lieutenant and other members from the fire department entered the building because Brown "was still unattended at this time." (Tr. at 56.)
 {¶ 14} Inside the apartment, the lieutenant asked Brown if she wanted to go to the hospital and if she could walk outside. Brown affirmed on both questions. Meanwhile, Eberly and Huss finished "assessing" Brown and "started an IV line on her, [and] attached a heart monitor on her * * *, which is all standard protocol for abdominal complaints." (Tr. at 57-58.)
 {¶ 15} On cross-examination, Eberly verified that, after he called the police and sought to re-enter the apartment, appellant did not "place her body in front of [him] so as to prevent [him] from entering the apartment[.]" (Tr. at 66.) Eberly also testified on cross-examination that appellant did not place "her body in front of [Officer Lemmon] to prevent him from coming in" the apartment. (Tr. at 70.) Lastly, on cross-examination, Eberly testified that "at no time did [appellant] prevent [him] from treating" Brown. (Tr. at 71.)
 {¶ 16} On redirect examination, appellee asked Eberly to clarify his testimony that appellant did not prevent him from treating Brown. Eberly stated: "In as much that [Huss] was tied up with someone else there, he wasn't able to deal with [Brown]. If I wasn't speaking with [appellant], I would have been talking to [Brown]." (Tr. at 71.) Eberly further stated that he "would have picked up where [Huss] left off with some assessment questions, physical exam, things we were not able to obtain on the scene" because "[Huss] was engaged in a conversation with someone else and I was engaged in the conversation with" appellant. (Tr. at 71-72.)
 {¶ 17} Next, Huss testified to the following on appellee's behalf. Huss is a paramedic with the Clinton Township Fire Division. On November 12, 2005, Huss and Eberly were dispatched to appellant's apartment. When the paramedics arrived, appellant "was holding the door open for [them] to get into the apartment." (Tr. at 94.) Appellant stated that her sister had abdominal pain. Huss then saw Brown lying on the floor with her face "down into the carpet." (Tr. at 96.) Huss began to talk with Brown, however, Huss could not understand Brown's responses because "she was talking basically into the floor." (Tr. at 98.) According to Huss, "I like to have face-to-face contact with someone regardless of pain. I can see — you know, do I see anything abnormal about her complaint, which was her abdomen." (Tr. at 98.)
 {¶ 18} Eventually, Huss asked Brown to go to the living room couch, and Brown went to the couch and laid down. Huss asked Brown to sit up so that he and Eberly could talk to her and check her vital statistics. Brown sat back up, and once her blood pressure was taken, she laid back down. Once again, Huss would ask Brown to sit up, and appellant raised her voice and argued. Although appellant raised her voice to Eberly, her reactions nonetheless interrupted Huss' assistance of Brown, and Huss asked Eberly to call the police.
 {¶ 19} Next, Eberly and appellant exited the apartment, and appellant was "very, very upset" and "yelling [and] screaming[.]" (Tr. at 103.) Appellant was "[t]hrowing her arms in the air * * * [and] really interfering with * * * [the paramedics'] care" for Brown. (Tr. at 103.) Huss "couldn't do anything because [he] heard a bunch of screaming and [Huss] was concerned about [Eberly]." (Tr. at 102.)
 {¶ 20} Eventually, Eberly and appellant returned to the apartment, and appellant was still "screaming[.]" (Tr. at 105.) Thereafter, "[a]nother male showed up." (Tr. at 105.) At that time, Huss stated: "`[W]e are going to go outside and wait on the police. Once the police get here, we will come back in and finish our care with'" Brown. (Tr. at 105.) Huss and Eberly left the apartment because they were afraid for their safety, but they remained on the premises because they had "to go back and take care of" Brown "once the scene [became] secure." (Tr. at 106.)
 {¶ 21} Huss and Eberly waited for the police outside the apartment building. Appellant exited, too, and a "couple minutes" later, a police officer arrived. (Tr. at 106.) The police officer and Huss and Eberly started to walk in the apartment, and appellant stated: "`You are not going into my fucking apartment.'" (Tr. at 108.) Huss did not respond and walked into the apartment. Huss then asked Brown if she wanted to go to the hospital, and Brown affirmed. Next, Huss asked Brown if she could walk outside, and Brown affirmed.
 {¶ 22} On cross-examination, Huss testified that he had Eberly call the police when appellant started "interfering with the care of" Brown. (Tr. at 119.) Huss indicated that appellant interfered with such care by raising her voice such that Huss could not talk to Brown, and Huss could not hear Brown's answers to his questions. Further, on cross-examination, Huss reiterated that he became afraid for his safety "[a]s soon as a male entered the apartment." (Tr. at 132.) Huss then testified that, when he temporarily left the apartment to wait for the police, he did not have enough information about Brown's condition and, thus, for all Huss knew, "Imani Brown could have died" after he temporarily left the apartment. (Tr. at 132.)
 {¶ 23} Next, on cross-examination, Huss identified his report of the November 12, 2005 incident. In the report, Huss stated that:
 * * * [Miller] who was on the phone with her grandma told her she would call her back because she's calling her husband. At that point I asked * * * Eberly to call [police department] * * *. At that time * * * Eberly stepped outside to call was followed by [Miller] another female. I heard screaming out in the hallway * * *. After * * * Eberly came back in a male showed up. At that time * * * Eberly myself felt threatened 
exited building to wait on CPD. Both women were abusive interfering with [patient] care. * * * I [advised] the woman why I called [police department] due to husband being called and not aware what was going to happen.
(Defendant's Exhibit D.)
 {¶ 24} On redirect examination, Huss clarified that, although he did not mention appellant's name in his incident report, he was also implicating appellant when denoting the conduct referenced in the incident report, e.g., "[b]oth women" were "interfering with patient care." (Tr. at 147.)
 {¶ 25} Thereafter, appellee rested its case, and Brown testified to the following on appellant's behalf. Brown was visiting appellant on November 12, 2005. Brown was helping appellant because appellant was sick, "going back and forth to dialysis[.]" (Tr. at 182.) Appellant was "always tired and throwing up[.]" (Tr. at 182.) Additionally, appellant recently had surgery.
 {¶ 26} On November 12, 2005, Brown experienced abdominal pain. (Tr. at 184.) The pain was "extreme" and equated a ten on a scale of one to ten. (Tr. at 184.) Brown was vomiting, bleeding, and having trouble walking.
 {¶ 27} Appellant, who had been sleeping, woke up and talked to Brown. During the course of events, Miller arrived with her children and, during the visit, asked if Brown wanted to go to the emergency room. Brown affirmed, and Miller stated that she would call her husband to have him get her children. Miller then called her husband and then called for an ambulance.
 {¶ 28} When Huss and Eberly arrived, Brown indicated that she was bleeding. Huss and Eberly then asked Brown if she could walk, and Brown stated that she could not walk. However, Huss and Eberly insisted that Brown walk to the couch. According to Brown, "[i]t was too much pain for [her] to get up, so both [her] sisters helped [her] up to the couch, and then [she] sat up * * * to sit comfortable, and as [she] was sitting comfortable, [Eberly] kept insisting [that she] sit up. So he started shoving [her] repeatedly, telling [her] to sit up for him to take [her] vitals." (Tr. at 185-186.) Eberly shoved Brown three or four times.
 {¶ 29} Ultimately, Huss stated: "`I think you're only on your period and you don't have to go to the hospital.'" (Tr. at 187.) During the course of events, Huss told Eberly to call the police. Appellant asked why Eberly was calling the police, and Huss stated: "`Because I don't feel like being harassed bysome big burly black dude[.]'" (Tr. at 188.) Brown assumed Huss was referring to Miller's husband.
 {¶ 30} Next, the paramedics indicated that they were going to leave, and appellant stated: "`Well, when they leave, I'm going to call their supervisor.'" (Tr. at 190.) In response, Eberly "actually screamed in [appellant's] face the [phone] number to her, like he didn't care if she called the supervisors or not." (Tr. at 190.) About 15 minutes later, Huss and Eberly returned with the police and other paramedics. One of the individuals stated: "`Look at her. She needs to go. Just look at her. You call tell she needs to go.'" (Tr. at 190-191.)
 {¶ 31} On cross-examination, Brown stated that she did ultimately go to the hospital and that she was given medicine at the hospital. On re-cross examination, Brown testified that, although Huss indicated that Brown did not need to go to the hospital, he never said that he would not take her to the hospital.
 {¶ 32} Lastly, appellant decided to testify on her own behalf. Early in her testimony, the following discussion took place between the trial court, appellee, and appellant's trial counsel:
 [APPELLEE]: * * * [M]y assumption is that there's going to be testimony about dialysis and Lupus, and at this point I'm going to object on the grounds that I think that's completely irrelevant to whatever was going on on the 12th, and I would ask that the Court exclude that. * * *
 [APPELLANT'S TRIAL COUNSEL]: * * * [I]t's definitely relevant, and the reason * * * is because it makes a fact and consequence more or less likely to be true, and the fact in particular is her physical strength and capabilities on that particular day, it was limited by her dialysis treatments.
 * * * It goes to show that she did not have the strength to physically impede or hamper these officers.
 [APPELLEE]: * * * I believe that without an expert, we can't hear about the effects of Lupus and dialysis with regard to impossibility, and for this reason I would ask that the Court exclude it.
 * * *
 THE COURT: There's already been testimony about her dialysis, and the fact that she was weak and tired. Her sister brought that in.
 * * *
 [APPELLANT'S TRIAL COUNSEL]: Well, I guess my question would be then, if I can't ask her about the dialysis, can I ask her how she felt that day, or is that not relevant either?
 * * *
 [APPELLEE]: * * * [I]f the question is simply, how were you feeling that day, and the answer is just, I wasn't feeling well, I'm not going to object. So if — if Counsel asks, were you feeling ill or were you not feeling well, I will not object to that question.
(Tr. at 205-206, 208-209.)
 {¶ 33} Next, the following testimony took place:
 [APPELLANT'S TRIAL COUNSEL:] * * * [H]ow did you feel that day [of November 12, 2005]?
 [APPELLANT:] Tired, nauseous, dizzy, the way I usually feel when I come from dialysis.
 [APPELLEE]: Your honor, I would just renew my objection.
 [APPELLANT'S TRIAL COUNSEL]: I asked her how she felt.
 THE COURT: I think that question has been asked and answered, and I would caution you, Counsel, to not proceed on that path any further based on our discussions and agreement.
 * * *
 [APPELLANT'S TRIAL COUNSEL:] What did you do when you got back to your apartment that day?
 * * *
 [APPELLANT:] I came home, threw up a couple of times, got out of my bed, laid down, went to sleep.
(Tr. at 209-210.)
 {¶ 34} Next, appellant testified to the following. While sleeping, appellant heard "a scraping noise and some moans." (Tr. at 210.) After appellant got out of bed, she saw Brown "halfway in the bathroom [and] halfway in the hallway" lying on the ground and crying. (Tr. at 210-211.) Appellant asked Brown if she wanted to go to the hospital, and Brown indicated that she did. Appellant proceeded to try to lift Brown up, but she could not because she had a catheter in her chest, a newly installed shunt in her arm, and she was in pain. Additionally, appellant was "disoriented, and [she] didn't feel well." (Tr. at 213.)
 {¶ 35} During the course of events, Miller arrived with her children. Appellant told Miller that Brown was ill. Miller and appellant tried to lift Brown to take her to the hospital, but they could not lift her and Brown was screaming "in agony[.]" (Tr. at 214.) Thus, Miller called 911. Meanwhile, Miller stated that she wanted to accompany Brown and appellant to the hospital, so Miller decided to call her husband, Elias Abbey, to have him pick up her children.
 {¶ 36} During the course of events, appellant heard sirens. Therefore, appellant walked outside of her apartment and saw that Huss and Eberly arrived. Appellant was "trying to show them where to come." (Tr. at 216.) However, Huss and Eberly "instantly became nasty" once they "saw [appellant's] face[.]" (Tr. at 216.) "They rolled their eyes numerous times. They were sharing some private joke that [appellant] didn't hear." (Tr. at 216.)
 {¶ 37} Appellant led Huss and Eberly into her apartment, and Huss started talking to Brown. Brown was able to respond to Huss' questions. However, the paramedics insisted that Brown move to the living room couch because they felt confined in the hallway. However, Brown was unable to get up until appellant and Miller helped her off the ground and moved her to the couch.
 {¶ 38} Once Brown reached the couch, she laid down. Huss told Brown to sit up so he could take her vital statistics. Brown did not sit up, and Eberly "[grabbed] her and he [dragged] her up and shoved her." (Tr. at 220.) Eberly shoved Brown three or four times; each time he shoved her, she laid back down. Brown was crying and moaning.
 {¶ 39} Huss and Eberly were yelling at Brown, and Brown continued to cry, stating: "`No, I'll just go with my sisters. Just please stop. Just stop. I'll just go with them.'" (Tr. at 223.) Miller became upset and called the paramedics' supervisors.
 {¶ 40} Meanwhile, appellant got up from the couch "and went into the kitchen [and] threw up." (Tr. at 240.) Next, Eberly walked out of the apartment, and appellant followed. Appellant asked Eberly if he called the police, but Eberly did not answer. Eberly and appellant returned to the apartment, and appellant asked Huss why Eberly called the police. Huss responded: "`I told him to call the police because I heard your sister on the phone saying she was calling her husband, and I don't feel like being harassed or threatened by some big black burly guy.'" (Tr. at 244.)
 {¶ 41} Huss also told Brown: "`I'm going to tell you what I think is wrong with you. I think you're just on your period, nothing's wrong.'" (Tr. at 244.) Thereafter, Abbey arrived, and Huss and Eberly "said that they were done, that nothing was wrong with" Brown, and "they were leaving." (Tr. at 246.) However, Officer Lemmon arrived, and appellant asked him what was happening. Ultimately, Officer Lemmon grabbed appellant's arm, and appellant screamed because she was in "agony. [She] just had a graph placed in [her] arm at that time for [her] dialysis." (Tr. at 259.)
 {¶ 42} Eventually, Officer Lemmon arrested appellant. However, Officer Lemmon did not take appellant to jail because she was too sick. Subsequently, appellant went to the hospital to get Brown.
 {¶ 43} On cross-examination, appellant clarified that Miller called 911 at appellant's request. Appellant also testified that she did not voluntarily scream when Officer Lemmon grabbed her arm.
 {¶ 44} The trial court charged the jury on misconduct at an emergency as a first-degree misdemeanor due to appellant allegedly creating a risk of physical harm to another. The trial court also charged the jury on the general fourth-degree misdemeanor misconduct at an emergency. The jury found appellant not guilty of the first-degree misdemeanor offense, but guilty of the fourth-degree misdemeanor offense, and the trial court sentenced appellant accordingly.
 {¶ 45} Appellant appeals, raising two assignments of error:
 FIRST ASSIGNMENT OF ERROR
 The jury verdict was not supported by sufficient credible evidence and was against the manifest weight of the evidence. As a result, Appellant was denied due process protections under the state and federal Constitutions.
 SECOND ASSIGNMENT OF ERROR
 The trial court erred in excluding relevant testimony about Appellant's physical condition.
 {¶ 46} In appellant's first assignment of error, appellant maintains that her misconduct at an emergency conviction is based on insufficient evidence. We disagree.
 {¶ 47} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307; State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but, whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 48} Here, appellant was convicted of fourth-degree misdemeanor misconduct at an emergency under R.C. 2917.13(A)(1), which states:
 (A) No person shall knowingly do any of the following:
 (1) Hamper the lawful operations of any law enforcement officer, firefighter, rescuer, medical person, emergency medical services person, or other authorized person, engaged in the person's duties at the scene of a fire, accident, disaster, riot, or emergency of any kind[.]
Specifically, the complaint against appellant stated that appellant violated R.C. 2917.13(A)(1), in pertinent part, by:
 * * * [k]nowingly hamper[ing] the lawful operation of a medical person, to wit: Tony Eberly [and] Todd Huss * * * by getting between them and the patient by screaming, yelling, cursing[,] telling them they need to leave because they didn't know what they were doing when they were engaged in their duties assessing the patient Imani Brown * * *.
 {¶ 49} We first examine the meaning of pertinent elements in R.C.2917.13(A)(1). R.C. 2917.13(A)(1) involves hampering the lawful operation of an "emergency medical services person," and R.C.2917.13(D)(1) states that "`[e]mergency medical services person' is the singular of `emergency medical services personnel' as defined in section2133.21 of the Revised Code." Under R.C. 2133.21(F), "emergency medical personnel" includes "emergency medical technicians-paramedic[.]" Thus, Huss and Eberly, emergency medical technicians-paramedics, each constitute an "emergency medical services person" under R.C.2917.13(A)(1).
 {¶ 50} Additionally, as noted above, R.C. 2917.13(A)(1) contains a "knowingly" mental element, and, under R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 51} However, "emergency" as used in R.C. 2917.13 is undefined by statute. Any term left undefined by statute is to be accorded its common, everyday meaning. State v. Dorso (1983), 4 Ohio St.3d 60, 62;State ex rel. Acker v. Green, Franklin App. No. 04AP-1335,2006-Ohio-5236, at ¶ 12. "`Words in common use will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them.'" Dorso at 62, citing Eastman v. State
(1936), 131 Ohio St. 1, paragraph four of the syllabus; Green at ¶ 12. "A common dictionary definition of `emergency' is, `an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate attention.'" Wolf v. East Liverpool City School Dist.Bd. of Edn., Columbiana App. No. 03 CO-5, 2004-Ohio-2479, at ¶ 40, quoting American Heritage Dictionary (2d College Ed.1922) 448.
 {¶ 52} In claiming that her misconduct at an emergency conviction is based on insufficient evidence, appellant first contends that no emergency existed during Huss' and Eberly's treatment of Brown. In response, appellee contends that appellant stipulated at trial that an emergency existed. A stipulation is an agreement between opposing parties as to an undisputed fact for which no evidence need be presented. State v. Dowd, Cuyahoga App. No. 80990, 2002-Ohio-7061, at ¶ 29. A stipulation, once entered into and accepted by the court, is binding upon the parties and is a fact deemed adjudicated for purposes of determining the remaining issues in a case. Id. Here, although appellant's trial counsel expressed a willingness to stipulate that an emergency existed, the parties never ultimately entered into such a stipulation for the trial court's acceptance, and, before the jury began deliberations, the issue of an emergency was not deemed adjudicated.
 {¶ 53} Regardless, the evidence established that an emergency, i.e., "an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate attention," existed throughout the time that Huss and Eberly treated Brown. Wolf at ¶ 40. On November 12, 2005, Brown was bleeding and experiencing abdominal pain; the pain equated to a "ten" on "a scale of one to ten[.]" (Tr. at 184.) While assisting Brown, the paramedics "started an IV line on her, * * * attached a heart monitor * * *, which is all standard protocol for abdominal complaints." (Tr. at 57-58.) Likewise, the situation was such that, according to Huss, when he temporarily left the apartment to wait for police, he did not have enough information about Brown's condition, and, thus, for all Huss knew, "Imani Brown could have died" after he temporarily left the apartment. (Tr. at 132.) Lastly, Brown repeatedly stated that she wanted to go to the hospital, and, eventually, Brown was taken to the hospital.
 {¶ 54} Next, considering Eberly's and Huss' testimony, and contrary to appellant's assertions, we conclude that sufficient evidence established that appellant knowingly hampered Huss' and Eberly's assistance of Brown during the emergency. As noted above, appellant knew that Huss and Eberly came to her apartment to assist Brown. However, Eberly and Huss testified that appellant interrupted their assistance of Brown by asking repeated questions in a badgering manner. Specifically, according to Eberly, appellant "would almost begin another question before she finished the first one. They just rolled right off her mouth. And she was * * * belligerent at this point. She attempted to raise her voice over mine any time I answered anything." (Tr. at 39.) Similarly, according to Eberly, appellant "was nearly screaming at this point" and "her lips were trembling, and she looked pretty upset." (Tr. at 40, 45.) Both Huss and Eberly confirmed that appellant's above-noted conduct hampered their ability to assist Brown.
 {¶ 55} Furthermore, because of appellant's conduct, Eberly called police and, thus, had to exit the apartment and leave Brown. In addition, as noted above, appellant delayed Eberly's attempts to proceed back into the apartment after he called police. Furthermore, when Eberly returned to the apartment, appellant continued to be disruptive, causing Huss to respond to appellant and precluding Huss from assisting Brown.
 {¶ 56} Accordingly, based on the above, we conclude that appellant's misconduct at an emergency conviction is based on sufficient evidence. Next, appellant contends that her conviction is against the manifest weight of the evidence. Again, we disagree.
 {¶ 57} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "`thirteenth juror.'" Thompkins at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545,547-548. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 58} Here, appellant first contends that the jury's determination that an emergency existed is against the manifest weight of the evidence. Rather, appellant claims that the weight of the evidence actually established that no emergency existed because, according to testimony from Brown and appellant, Huss indicated that Brown was merely "on [her] period" and, according to Brown, Huss further stated that she did not need to go to the hospital. (Tr. at 187.)
 {¶ 59} However, such stated opinions from Huss do not negate the above-noted evidence that underscored the emergency. Again, Brown was bleeding and in extreme pain. Huss and Eberly started an "IV line" on Brown and attached a "heart monitor" to her. (Tr. at 57-58.) Moreover, the lieutenant confirmed the emergency situation with Brown, noting: "`Look at her. She needs to go. Just look at her. You can tell she needs to go'" to the hospital. (Tr. at 190-191.)
 {¶ 60} Next, appellant claims that the weight of the evidence demonstrated that no emergency existed because, during the course of events, Huss and Eberly both left Brown to wait for the police to arrive. However, such circumstances do not negate the emergency, but merely emphasize appellant's hampering conduct, especially considering Huss' testimony that he and Eberly did not just leave the scene because they had "to go back and take care of [Brown] once the scene becomes secure." (Tr. at 106.)
 {¶ 61} Appellant claims that the weight of the evidence demonstrated that no emergency existed because Huss and Eberly had Brown move off the floor to the living room couch without giving or offering assistance, and, according to appellant, Eberly repeatedly pushed Brown into an upright position while Brown was on the couch. Again, we cannot conclude that such actions by Huss and Eberly negate the emergency situation. Rather, Huss' and Eberly's request that Brown move to the living room couch and the testimony depicting Brown's difficulty in moving to the couch, both underscore the above-noted evidence that demonstrated the emergency situation.
 {¶ 62} Next, appellant contends that the weight of the evidence established that appellant did not hamper Huss' and Eberly's assistance of Brown. Rather, appellant argues that the evidence indicated that Huss and Eberly were actually concerned about Abbey's appearance at the scene. Specifically, appellant notes that: (1) Huss wrote in his report that the paramedics called police because Miller called for Abbey to come; (2) Huss testified that he was concerned for his safety following Abbey's appearance; and (3) Huss and Eberly testified that they left the apartment to wait for the police after Abbey appeared. While the evidence did establish that Huss and Eberly were concerned about Abbey's appearance at the scene, the evidence demonstrated that such a problem was additional to appellant's hampering conduct during the emergency. As noted above, Huss and Eberly also testified to appellant's hampering conduct, and Huss also verified in his report that appellant was "abusive and interfering" with the emergency. (Defendant's Exhibit D.)
 {¶ 63} In further claiming that the weight of the evidence established that appellant did not hamper Huss' and Eberly's assistance of Brown, appellant argues that she actually assisted Brown and ensured that Brown received proper medical care. Specifically, appellant notes that she helped Brown move to the living room couch, she indicated that she would take Brown to the hospital because Huss and Eberly had no plans to do so, and because it was her and Miller's concern for Brown that prompted the call to Huss' and Eberly's supervisor, who, upon arriving at the scene, indicated that Brown needed to go to the hospital. However, while appellant may have done such acts on behalf of Brown, such conduct from appellant does not negate Huss' and Eberly's above-noted testimony concerning appellant's other disruptive, hampering conduct that caused Huss and Eberly to consistently divert their attention from Brown.
 {¶ 64} Lastly, we reject any suggestion from appellant that, due to her ill condition, the weight of the evidence established that appellant could not and did not hamper Huss' and Eberly's assistance of Brown. Appellant did testify that, on the morning of November 12, 2005, she felt "[t]ired, nauseous, dizzy, the way [she] usually feel[s] when [she] come[s] from dialysis[,]" she "just had a graph placed in [her] arm * * * for [her] dialysis" and she "had a catheter in [her] chest, and a newly installed shunt in [her] arm, and * * * [she] was in pain. * * * [She] was disoriented, and [she] didn't feel well." (Tr. at 209, 259, 212-213.) However, appellant also admitted to conduct that demonstrated that she was not entirely incapacitated on November 12, 2005, and was able to hamper Huss' and Eberly's assistance of Brown in the manner demonstrated above. In particular: (1) appellant was able to walk outside of her apartment to initially meet Eberly and Huss; (2) appellant, albeit with the assistance of Miller, moved Brown from the floor to the couch while Huss and Eberly were present; (3) appellant was able to confront Eberly outside her apartment about calling the police; (4) appellant had planned to take Brown to the hospital; and (5) appellant ultimately went to the hospital "to pick [Brown] up" after the end of the November 12, 2005 incident. (Tr. at 262.)
 {¶ 65} Accordingly, we conclude that appellant's misconduct at an emergency conviction was not against the manifest weight of the evidence. Having also concluded that appellant's misconduct at an emergency conviction was not based on insufficient evidence, we overrule appellant's first assignment of error.
 {¶ 66} In her second assignment of error, appellant contends that the trial court erred by not allowing her to testify that she suffered from Lupus and by not allowing more in-depth testimony surrounding her dialysis to treat the Lupus. We disagree.
 {¶ 67} A trial court has broad discretion in the admission or exclusion of evidence, and we will not disturb the trial court's decision on such matters absent an abuse of discretion. State v.Lowe (1994), 69 Ohio St.3d 527, 532. An abuse of discretion connotes more than an error of law; it entails an unreasonable, arbitrary or unconscionable decision. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 68} Here, appellant argues that testimony that she suffered from Lupus and more in-depth testimony concerning appellant's dialysis for Lupus would have legitimized testimony on how ill she felt on November 12, 2005, and would have given credence and support to her claimed inability to interfere with Huss' and Eberly's assistance of Brown. However, appellant did not proffer any evidence concerning Lupus, symptoms of Lupus, and whether such symptoms hindered appellant's ability to interfere with Huss' and Eberly's assistance of Brown. Likewise, appellant did not proffer evidence illuminating how more in-depth testimony concerning her dialysis for Lupus was needed to demonstrate her claimed inability to interfere with Huss' and Eberly's assistance of Brown. Absent theproffered evidence, we can only speculate as to the nature of the precluded testimony, and, as a result, we are unable to properly examine whether the trial court erred by not allowing the testimony. See State v. Chapin (1981), 67 Ohio St.2d 437, 444;City of Columbus v. Kelly (Aug. 8, 1991), Franklin App. No. 91AP-120. Therefore, we overrule appellant's second assignment of error.
 {¶ 69} In summary, we overrule appellant's first and second assignments of error. As such, we affirm the judgment of the Franklin County Municipal Court.
Judgment affirmed.
 PETREE and BROWN, JJ., concur.