[Cite as *State v. Mapes*, 2021-Ohio-257.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 1-20-28

    v.

PETER B. MAPES,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Lima Municipal Court
Trial Court No. 19CRB01421

**Judgment Reversed and Cause Remanded**

Date of Decision: February 1, 2021

APPEARANCES:

    *Zachary D. Maisch* for Appellant

    *David Osborne, Jr.* for Appellee

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Peter B. Mapes ("Mapes"), appeals the June 10, 2020 judgment entry of sentence of the Lima Municipal Court convicting him of misconduct at an emergency in violation of R.C. 2917.13(A)(1). For the reasons that follow, we reverse.

{¶2} On May 28, 2019, at approximately 7:36 p.m., Lieutenant Shawn Cook ("Lieutenant Cook"), of the Ohio State Highway Patrol responded to a one-vehicle accident involving Bonnie Juras ("Juras") in the northbound lanes of I-75, near the State Route 65 overpass, in Allen County, Ohio. (Dec. 10, 2019 Tr. at 5, 8). According to Lieutenant Cook, "this particular area is * * * known to have quite a few crashes. It's kind of * * * a dangerous area * * * [a]nd this particular day it was raining, so the roads were wet." (*Id.* at 8). Lieutenant Cook testified that his "first priority" when arriving at an accident scene is "to protect the scene" by ensuring no "secondary crashes happen." (*Id.* at 8-9). "[D]ue to the unique location of this particular crash, it was important for [Lieutenant Cook] to keep [his] patrol car south of the crash area due to the incline of the roadway [because] vehicles * * * traveling northbound can have a difficult time seeing a crash that is on the overpass or just north of it." (*Id.* at 9). Lieutenant Cook further testified that he "actually had to act as a traffic agent * * * to assure traffic was getting over [and] it was important for [him] to maintain * * * scene * * * control to ensure all of this traffic was going to

the right lane and staying in the right lane. So, what that required [him] to do was keep [his] patrol car near the exit ramp and [he] actually had to walk towards the bridges deck, so he was sort of another traffic control device [himself], with [his] vest on with [his yellow] reflective vest * * * ." (*Id.* at 9).

{¶3} According to Lieutenant Cook, his "intention was to get [Mapes] off-scene as quickly as possible" "to maintain scene security" because "this particular stretch of road is * * * *very* dangerous when there is a crash [and he could recall] many scenarios where this same exact sequence of events has occurred and [Ohio State Highway Patrol] officers have nearly gotten hit where [Mapes] was parked at." (Emphasis added.) (*Id.*). Indeed, Lieutenant Cook testified that his "idea is to get people out as quickly as possible" because he does not "want anyone to be north of that bridge deck because in [his] experience * * * cars [in] in that situation have become crash victims themselves." (*Id.* at 11-12).

{¶4} Lieutenant Cook testified that he requested dispatch to have Juras "walk back to [him]," but that Mapes "said that [Juras] was not going to come back to [him]." (*Id.* at 11). He testified that Mapes did not want Juras to walk back to him on I-75 over the State Route 65 overpass based on Mapes's "medical field experience and injuries and * * * knowing that it was unsafe for [Juras] to walk back to [him]." (*Id.* at 17). He further testified that he again "asked [his] dispatch to tell [Mapes] to have [Juras] walk back to" him and "that request happened two or three

times and [Juras] never walked back to [him]." (*Id.* at 14). Thereafter, Lieutenant Cook and Mapes "had a conversation that was a long distance away" (while Lieutenant Cook was "still acting as sort of a * * * traffic control device") during which Mapes told Lieutenant Cook that "he [was] going to take off * * * with [Juras] and come back around." (*Id.*). He agreed that Mapes's actions "add[ed] additional time * * * to complete [his] investigation of the scene[.]" (*Id.* at 21).

{¶5} On cross-examination, Lieutenant Cook testified that there was a distance of approximately 400 feet between his cruiser and Mapes's vehicle and that it was raining. (*Id.* at 25). Lieutenant Cook agreed "the danger was there inherent in the way that the design of that bridge was made, because it was in an area where there are many accidents." (*Id.* at 28). Lieutenant Cook testified that, after Mapes returned, he parked "right behind [him]." (*Id.*). In sum, Lieutenant Cook testified that the accident scene "was pretty volatile and pretty extreme"; that Mapes "refused to let Mrs. Juras walk on her own back to [his] cruiser; and that Mapes "left and came back and parked behind [his] cruiser [and] ma[d]e sure that Mrs. Juras was safe." (*Id.* at 35-36). However, when asked if Mapes's "misconduct" could be summarized as "not listening to what [he] wanted him to do," Lieutenant Cook disagreed and provided the following explanation:

> When officers are dispatched to a scene there are multiple things that must be done. * * * [S]cene security. I need to protect the integrity of the crash. Protecting the integrity of the people involved. * * * People can hide evidence. * * * [P]eople can put open containers some

place. They can put drugs places. Paraphernalia. * * * [T]hey can switch drivers. * * * I have to protect the integrity of the investigation. * * * [I]t's not just about what Mr. Mapes [sic] intentions were * * * to provide safety. I ha[d] intentions too. And my intentions [were] to keep a crash scene safe. * * * [T]o protect the integrity of the crash scene. So, while * * * I understand * * * what he was doing, he was wrong. * * * I believe I have [sic] the conversation about the weather, it's not a substantial point to me because I'm standing there too. * * * He didn't present any qualifications about being a meteorologist. * * * So, those particular things don't necessarily * * * dictate how I solve and investigate this particular crash [and] those aren't the only things to protect at a crash scene. * * * [T]here's a whole bunch of things that aren't safe but you have to mitigate safety and * * * getting her to me quickly, and in my patrol car and safe is better than having someone else get hit on the side of the road.

(*Id.* at 36-37).

{¶6} On re-direct examination, Lieutenant Cook testified that the accident did not shut down all lanes of travel on I-75. (*Id.* at 40).

{¶7} Mapes testified in his defense that he is a medical doctor and that he found Juras "standing on the other side of the wire barrier" of I-75 after her "vehicle had impacted the bridge abutment on the left side of the overpass." (*Id.* at 52). Mapes testified that he assisted Juras with contacting 911 for emergency assistance and permitted her to wait inside his vehicle until law enforcement arrived. (*Id.* at 52-53).

{¶8} When Lieutenant Cook arrived at the scene, Mapes exited his vehicle to see if Lieutenant Cook "require[d] anything"; however, "[a]s [he] got about halfway across the bridge * * *, [Lieutenant Cook] shouted 'keys'," but Mapes

could not understand him because of the noise from the traffic and the rain. (*Id.* at 56-57). Once Mapes understood that Lieutenant Cook wanted the keys to Juras's vehicle, Mapes obtained Juras's keys and gave them to Lieutenant Cook but did not "have any discussion with him," "just gave him the keys, said here you go, and * * * went back and sat in [his] car." (*Id.* at 57). Thereafter, according to Mapes, the dispatcher called him and said "you need to bring [Juras] back to [Lieutenant Cook]." (*Id.* at 58). In response, Mapes testified that he

> had a duty to tell [Lieutenant Cook] * * * that [he] could not walk her back. So, [he] got out of the car, [he] trotted back to [Lieutenant Cook], who was holding a broom and was trying to clear the * * * debris out of the street. [He] got within 4 feet of him and [he] said [he] could not bring her back because it wasn't safe. And at this point, he goes into a tirade, * * * with a raised voice shouting at [him] saying that he would not tell [him] what to do in [his] emergency room and that [he] should not tell him what to do at the scene of an accident.

(*Id.* at 58-59). According to Mapes, he told Lieutenant Cook, "'Unless you have any objection, I'm going to drive Mrs. Juras up to the next exit, drive her back-down south and bring her over to you * * *," to which Lieutenant Cook did not respond. (*Id.* at 59-60). Mapes testified that—had Lieutenant Cook listened to him—he would have told him that he

> had three concerns. The first concern was that we already had one accident at this location and that traffic was still flowing through at 65 miles an hour and that we could run the risk of a second accident. * * * The second concern * * * was that * * * there was lightening * * * very close to the scene. * * * Lastly, * * * Mrs. Juras showed evidence of shock and her actions were delayed [and he] was worried

that if [he] brought her back to the scene or back past the scene towards the officers [sic] car that she would freeze.

(*Id.* at 60-61).

{¶9} Mapes called Juras to testify in his defense who testified that she "hit a dip right before the overpass[, which] was filled with water because it had just started to downpour" and caused her to hit the bridge embankment. (*Id.* at 66). Juras testified that she was "in shock" after the accident and stranded in the median (unable to call 911 for emergency assistance and her insurance representative because her cell-phone battery was too low) when Mapes stopped to offer her assistance. (*Id.* at 68). According to Juras, she never spoke with Lieutenant Cook until Mapes drove her to the rear of his cruiser. (*Id.* at 69).

{¶10} On June 3, 2019, Mapes was charged with misconduct at an emergency in violation of R.C. 2917.13(A)(1), a fourth-degree misdemeanor. (Doc. No. 1). On June 6, 2019, Mapes appeared and entered a plea of not guilty. (Doc. Nos. 4, 6).

{¶11} After a bench trial on December 10, 2019, the trial court found Mapes guilty on June 9, 2020 of the misconduct-at-an-emergency charge and ordered him to pay a $50.00 fine and court costs. (Doc. No. 15).[1]

---

[1] The trial court filed its judgment entry of sentence on June 10, 2020.

{¶12} Mapes filed his notice of appeal on July 7, 2020. (Doc. No. 17). He raises four assignments of error for our review. We will begin by addressing his first assignment of error, followed by his second, third, and fourth assignments of error together.

**Assignment of Error No. I**

**The trial Court erred by finding against the weight of the evidence that the defendant knowingly hampered the lawful operations of a law enforcement officer.**

{¶13} In his first assignment of error, Mapes argues that his misconduct-at-an-accident-scene conviction is against the manifest weight of the evidence. Specifically, Mapes argues that weight of the evidence shows that he did not *hamper* the lawful operations of a law enforcement officer at the scene of an accident. We agree.

*Standard of Review*

{¶14} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A

reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Analysis*

{¶15} Mapes was convicted of misconduct at an emergency in violation of R.C. 2917.13(A)(1), which provides, in relevant part, that "[n]o person shall knowingly" "[h]amper the lawful operations of any law enforcement officer * * * engaged in the person's duties at the scene of a * * * accident, * * * or emergency of any kind." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶16} On appeal, Mapes argues only that weight of the evidence shows that he did not *hamper* Lieutenant Cook's investigation at the accident scene. Because it is the only element that Mapes challenges on appeal, we will review the weight of the evidence supporting only whether Mapes *hampered* the lawful operations of a law enforcement officer engaged in his duties at the scene of an accident.

{¶17} The term "hamper" is not defined by the statute. "Any term left undefined by statute is to be accorded its common, everyday meaning." *State v. Blocker*, 10th Dist. Franklin No. 06AP-313, 2007-Ohio-144, ¶ 51. A common dictionary definition of "hamper" is "to interfere with." *Merriam-Webster's Collegiate Dictionary* 564 (11th Ed.2003). The term "interfere" commonly means "to interpose in a way that hinders or impedes." *Id.* at 652. *See also State v. Stephens*, 57 Ohio App.2d 229, 230 (1st Dist.1978) (applying the plain meaning of the words "hamper" and "impede" to define the obstructing-official-business statute); *State v. Buttram*, 1st Dist. Hamilton No. C-190034, 2020-Ohio-2709, ¶ 19 (defining impeding as a synonym of hampering under the obstructing-official-business statute).

{¶18} Our sister appellate district observed that "[t]here are only a handful of decisions that have discussed this offense. The common thread they share is that the defendant acted-out in a way that interfered with an official's investigation of an accident or emergency." *State v. Bryant*, 9th Dist. Lorain No. 09CA009736, 2011-Ohio-4555, ¶ 12. In sum, the Ninth District Court of Appeals (after reviewing the way in which courts applied the offense) concluded that—to be guilty of misconduct at an emergency—"the defendant [must] engage[] in some meddlesome or obstreperous conduct." *Id.* at ¶ 21.

{¶19} Based on our review of the record, we conclude that the trier of fact lost its way in concluding that Mapes hampered Lieutenant Cook's duties at the accident scene. That is, we conclude that the weight of the evidence shows that Mapes did not interfere with (or impede) Lieutenant Cook's investigation by not complying with Lieutenant Cook's order in the way suggested because such would have potentially put Juras in peril, but, instead, found an alternative way to *comply* that was safer under the facts presented. Specifically, the evidence demonstrates that Lieutenant Cook encountered Mapes—who was already assisting Juras—after she had been involved in a one-vehicle accident on I-75, near the State Route 65 overpass. In other words, Mapes was not the "'bystander [or] curiosity seeker[] at [an] emergency scene'" for which the rule is sought to be used "as 'a specific tool for crowd control at emergencies.'" *Id.* at ¶ 22, quoting R.C. 2917.13, Legislative Service Commission Note (1973).

{¶20} Moreover, the evidence in the record reflects that Mapes and Juras were subject to *significant* danger from the specific stretch of roadway—as revealed by Lieutenant Cook's testimony—and Mapes's rational decision to comply with Lieutenant Cook's request in an alternative way that did not put Juras in potential peril was prudent under the facts presented. Specifically, the evidence in the record reflects that Lieutenant Cook ordered Juras to walk nearly 400 feet from Mapes's vehicle—across the State Route 65 bridge without the safety of a median—against

moving traffic on I-75 during questionable weather conditions, which had produced heavy rainfall. Instead of permitting Juras to traverse the potential gauntlet—without the aid of the yellow-reflective vest of which Lieutenant Cook was equipped—Mapes drove Juras safely to the rear of Lieutenant Cook's cruiser.

{¶21} Based on our review of that evidence, we cannot conclude that the conduct of which Mapes is accused of violating is the conduct prohibited under the statute considering Mapes complied with Lieutenant Cook's order—albeit in a different manner—by ensuring the safety of Juras. *See id.* at ¶ 24. Mapes's conduct in this case is not the meddlesome or obstreperous conduct sought to be prevented by the statute. Indeed, much like the obstructing-official-business statute—which requires a defendant to have *hampered* or *impeded* a public official in the performance of his or her lawful duties—"[b]oth * * * definitions make clear that there must be some substantial stoppage of the officer's progress before one can say he was hampered or impeded." *Stephens*, 57 Ohio App.2d at 230.

{¶22} Based on our review of the record, the evidence presented in this case weighs against the conclusion that there was some substantial stoppage of Lieutenant Cook's progress in his investigation. *See Bryant* at ¶ 24 (concluding that "Bryant's allegedly false answers given well after the emergency had abated, however, did not knowingly hamper the operations of a law enforcement officer engaged in his duties at the scene of a fire"). *See also Stephens* at 230. In particular,

there is no evidence in the record that Mapes caused any disturbance or was disruptive at the scene. *Compare Bryant* at ¶ 23 (noting that "there was no evidence that she caused any disturbance or was disruptive"). Likewise, the evidence in the record weighs against the conclusion that Mapes interfered with (or impeded) Lieutenant Cook's accident investigation in any way. Specifically, Lieutenant Cook's testimony reflects his primary concern of accident-scene safety and the actions that he took to implement that concern. In other words, Lieutenant Cook's testimony does not support that he was involved in the investigatory stage when Mapes drove Juras to his cruiser instead of permitting her to traverse I-75 on foot.

{¶23} For these reasons, we conclude that the trier of fact clearly lost its way in concluding that Mapes hampered the lawful operations of a law enforcement officer engaged in his duties at the scene of an accident. Accordingly, we are persuaded that Mapes's misconduct-at-an-emergency conviction must be reversed.

{¶24} Therefore, Mapes's first assignment of error is sustained.

### Assignment of Error No. II

**The trial Court erred by finding against the weight of the evidence that the defendant had not proven the affirmative defense of necessity.**

### Assignment of Error No. III

**The trial Court erred by denying the defendant due process and prohibiting defendant from testifying about his observations and conclusions the accident scene.**

**Assignment of Error No. IV**

**The trial Court erred by applying Crim. R. 16(K) in an unconstitutional manner that violated the defendant's right to remain silent pursuant to the 5th Amendment of the United States Constitution prior to trial.**

{¶25} In his second assignment of error, Mapes argues that his conviction is against the manifest weight of the evidence because he acted out of necessity. In his third and fourth assignments of error, Mapes argues that the trial court erred by prohibiting him "from testifying about his medical opinion regarding the condition of [Juras]" under Crim.R. 16(K). (Appellant's Brief at 9).

{¶26} In light of our decision to sustain Mapes's first assignment of error, his second, third, and fourth assignments of error are rendered moot, and we decline to address them. App.R. 12(A)(1)(c). *See State v. Copeland*, 3d Dist. Paulding No. 11-80-14, 1981 WL 6707, *4 (Nov. 2, 1981); *Cleveland v. Schumann*, 8th Dist. Cuyahoga No. 95530, 2011-Ohio-741, ¶ 15.

{¶27} Having found error prejudicial to the appellant herein in the particulars assigned and argued in his first assignment of error, we reverse the judgment of the trial court and remand for further proceedings.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**